Good morning. May it please the Court, I'm Matt Adams with Northwest Immigrant Rights Project. On behalf of plaintiffs, I'll seek to reserve two minutes for rebuttal. The Court's prior decision in this case, Indira Gonzalez, was the first time a Court of Appeals had applied Brand X, determining that it must defer to and adopt an agency's interpretation of an ambiguous statute, even though it contradicted this Court's prior interpretation of that same statute. What necessarily follows, and the remaining question is whether this adopted rule should be applied retroactively to those who had already acted in reliance on the old rule before it was overturned. Well, in your argument, one of the things that in the Knights, in our opinion of November 20, 2007, the opinion states the plaintiffs as a matter of law are not eligible to adjust their status because they're ineligible to receive an I-212 waivers. Why does that statement not control on the question of retroactivity? Because before the Court at that time was a preliminary injunction that had been granted by the District Court for the class. And the class and the plaintiffs included not just the named plaintiffs and those who had already applied, but prospective applicants who would apply in the future. And so the order that was presented to the Court of Appeals was a broader order and a broader class of plaintiffs. On remand, where the Court ordered that the District Court proceed with proceedings consistent with its order, plaintiffs moved to amend the class and also to modify the complaint so that it only focused on those who had already acted in reliance. And it was there that the Court found that the rule must be applied to all. And similarly, subsequent to that, in Morales y Squierdo, the Court found that as a judicial interpretation, it must be applied retroactively to all. But this analysis of — and one other point that I'd make about the Court's first order is that the Court, in the first instance, was never — was never addressed with any retroactivity arguments. That is to say, on that preliminary injunction that was on appeal, there was no challenge submitting that since the rule was still standing, the old rule was still standing at the time, plaintiffs did not present a challenge as to the inappropriate retroactivity of a new rule being adopted by the Court. But isn't it — but isn't it included in it by virtue of who it applies to? Doesn't it apply retroactively? Our position would be that, one, given that the plaintiffs that were before the Court at that time was the broader class, that it wasn't whole — didn't speak to the more specific and narrower class. No, but our comments seem to have included the whole class that was before us when we said plaintiffs aren't eligible to — for this relief. Doesn't that — I mean, if that applies to everybody, what does it matter that you present us now with a narrower class? It could be read that way. Although I would note that Morales y Squierdo, the panel there didn't read it that way, and that's why they engaged in the retroactivity analysis for the first time. But more importantly, I would note that this case is still before the Court, and this Court's subsequent en banc decision in Nunez-Reyes is still instructive as to why a new judicial interpretation must apply the Chevron oil analysis in determining whether it should be given retroactive effect. So even though prior understanding, at least in Morales y Squierdo — of course, this Court didn't specifically address why it should be applied retroactively, but that prior interpretation in Morales y Squierdo has been undermined by the Court's clarification that Chevron oil remains binding even though it's at tension, there's some tension with subsequent Supreme Court cases. And in doing that, the — this Court, en banc, made clear that Chevron oil should be applied where you're dealing with a judicial interpretation of a civil matter that presents a new rule and that it doesn't concern the Court's jurisdictions. These qualifications are all met. Let me ask you, as you know, I'm the new kid in school here, taking over from Judge Hall. I want to make sure I have a good handle on the facts. Do I understand correctly these people were removed from the United States at some point? When? Originally? So the — there's eight plaintiffs here, removed at different times, but all were removed prior to submitting applications. What year are we talking about? We're talking about generally between 1997 and 2001, although there might have been one that was — That was the original removal? That was the original removal. And then they all unlawfully reentered after that point. When were the subsequent removals? Or the — when did they reenter, I guess? They all subsequently reentered, most of them immediately after the prior removal to join with their family members. Around 2001. Anywhere from 1997 to roughly around 2001. Because — Actually, I'm sorry if I made — they all reentered prior to December of 2000, because in order to qualify under the LIFE Act, they had to demonstrate that they were physically present on December 20th of 2000. So all of the deportations and subsequent reentries of this group of plaintiffs had occurred prior to that time. Here's what I'm trying to get my mind around. They want the benefit of the Perez-Gonzalez rule, which came out in 2004. So when they reentered, Perez-Gonzalez wasn't even on the books. So I don't quite see why they would have an equitable argument that they came in in reliance on Perez-Gonzalez when Perez-Gonzalez wasn't even decided yet. Yes, but we don't argue that it was their reentry, its reliance that caused that unlawful reentry. The reentry was to come back here and join their families. Rather, it was the application for adjustment of status under the LIFE Act, where Congress had, in December of 2000, passed this law providing a four-month period, this ameliorative relief for this group of individuals, saying we're going to give you one last chance. If you have a petition filed by May of 2001 on your behalf, then you'll get to pay an extra $1,000 penalty fee in addition to the other fees and have your applications adjudicated. So it was their action in stepping forward and applying for adjustment of status, paying thousands of dollars. Like I said, not only the ---- Right. But they have to be eligible. They have to be eligible. And if they're not eligible, they're not eligible. And but at the time they applied, Perez-Gonzalez had already been issued. And Perez-Gonzalez made clear that they were eligible. And so that's when they stepped forward. They gathered, for many of them, their life savings, paying all of this money, coming forward to immigration, saying we want to take advantage of the LIFE Act, of this one opportunity that we have to remain together as a family, notwithstanding our prior reentry. And so the reliance comes upon the action that they've taken, stepping forward and applying. And this is similar to one of the cases that we cited in our supplemental brief, although dealing with a statutory ---- Isn't that a lot different than Nunez-Reyes, the reliance in Nunez-Reyes? I don't believe so. There's a different action taken in Nunez-Reyes. There's the reliance action. There was the plea. But the point is that they took an action that includes a substantive property interest, the thousands of dollars they paid, as well as in ---- But they're not eligible. But they were. They may have done all these things, but they're not eligible. When they applied, they were eligible. The clear precedent of this Court said, yes, you have this opportunity. Hundreds of individuals had already been granted pursuant to Perez-Gonzalez. And even after the Board issued its decision in a matter of Tories, we cited half a dozen subsequent cases from the Board where the Board continued to rule in favor of the noncitizen, saying that they have the opportunity under Perez-Gonzalez if they're in the Ninth Circuit to apply for adjustment of status and receive the benefits of that decision. So it's true that Duran-Gonzalez makes clear that they are now no longer eligible. But at the time they applied, they were. At the time they applied, not at the time they reentered the United States. At the time they reentered the United States, it was unclear. When IHRA was first passed in 1996 and then went into effect in April of 1997, it went across the Board how the adjudicators were dealing with these applications. Our organization, Northwest Immigrant Rights Project, represented hundreds of individuals. And for the first several years, most of these applications were granted before Immigration Service began to take a more restrictive view that Section 1255I did not afford them the opportunity to – and, of course, 1255I is the section that was extended by the Life Act. Well, if we believe that the – that Nunez-Reyes – I'm sorry, that Duran-Gonzalez, that by virtue of the fact that we applied it to the whole class at the time, that that was our proclamation, that it is retroactive, do you lose? I don't think so, because I think this Court's en banc decision in Nunez-Reyes provides intervening authority. Well, except Nunez-Reyes essentially states, a court announcing a new rule of law must decide between pure retrospectivity and full retroactivity. And if we find that by applying it to the entire class that was our proclamation that it was fully retroactive, what authority can you cite that would allow this Court to declare that the 2007 opinion was not retroactive? I know this is all facts, you know. I would go back to the point that on appeal was the government's appeal challenging the preliminary injunctive relief to the class as a whole. And at that point in the litigation, there was no argument created regarding the retroactive application of a new rule, because the new rule had not yet been announced. But by virtue of the fact that we applied it to people retroactively, why wasn't that our statement? I think because it didn't explicitly say that it should be applied retroactively. And if you look at, for example, the Supreme Court's case in Breck v. Abrahamson, where it's talking about stare decisis, and it says that it's not applicable unless the issue was, quote, squarely addressed, end quote, in the prior decision. If Nunez-Reyes is a perspective-only opinion, how can it overrule a prior three-judge opinion of this Court? Well, I think that Nunez-Reyes clarified what the law should have been all along, because you even had, prior to any of these decisions, you had this Court's en banc decision in George v. Camacho, which, again, relied on Chevron oil and demonstrated the continuing vitality of Chevron oil. And in Nunez-Reyes, they said they cited to George Camacho, but noting insofar as it touches upon this Court's jurisdiction, then it's overturned. But setting aside that small issue, you already had controlling authority from this Court declaring that the Court should have applied the Chevron oil analysis. And even – and so what you had is courts applying kind of a mixed bag up until Nunez-Reyes. Earlier this year, in – for example, in Goodman v. Staples, you had a panel of this Court ordering that the judicial interpretation should be prospectively applied. And so you didn't have a uniform application. There was a lot of different understandings of the status of Chevron oil prior to Nunez-Reyes. But Nunez-Reyes clarified what the correct law has been all along. Does Nunez-Reyes say that you always have to apply a Chevron analysis whenever you're deciding a case, or does it just say you may apply it? Well, it doesn't have language saying that it's permissible to apply it. It clarified that the Court's required to apply it if those three qualifications are met. And then – and I'd read one quote from it. It says, A court announcing a new rule of law must decide between pure prospectivity and full retroactivity, end quote. And that's in the context of talking about why Harper and Beam, which dealt with piecemeal adjudication of whether it should be prospective or retroactive. But nonetheless, you're laying out a general principle that Chevron oil is controlling and Chevron oil must be applied on its face. So is Nunez-Reyes applying it to a judicial opinion? It's applying it to a judicial interpretation, yes. A judicial opinion? Yes. Like Duran-Gonzalez. Duran-Gonzalez, like Duran-Gonzalez. You know, we originally argued – Well, is it – are they exactly the same? We originally argued that Duran-Gonzalez shouldn't constitute a judicial opinion because, really, it's forced to defer to a reasonable interpretation of the agency. And that's why we argue – So I didn't write a judicial opinion in Duran-Gonzalez? We argue there wasn't a judicial interpretation as to the rule and that it wasn't stated  So it is an opinion, though, still. It's certainly an opinion. That's correct. I just want to find out if I'm kind of doing something different than everyone else. I know what it was, too. I'm sure you want to add. I see you're down to a minute and a half or so. Okay. Thank you. Thank you. Good morning. Good morning. Good morning. Good morning. Good morning. May it please the Court. My name is Elizabeth Stevens, and I represent the government of the United States and defendants in this case. The government wins in this case for five separate reasons. First, we win because of the rule of law and the rule of the case. When this Court issued its decision in Duran-Gonzalez, it clearly applied its rule in that case to the full plaintiff class before it, to both class representatives and the class members of the class before it. Even in George v. Camacho, the Court specifically noted that if the new rule is applied in the case in which it was announced, it must be applied to all pending cases. This is not a case here, Duran-Gonzalez. It's not a case like Linkletter or Chevron Oil in which someone else is seeking relief from a rule of law that was settled in somebody else's case. This is a case in which one party litigated a case, lost it, and wants to avoid the consequences of litigation. Now, they did they kind of fine-tuned the class when it went back down. What? Does that have any effect? Well, they sought to fine-tune the class, but the Court denied that. This is an interesting case because you have class counsel and class representatives who represented the former larger class wanting to say, well, no, we don't want to represent the whole class anymore. We only want to represent this small subclass. So it's still the people, the individuals to whom the rule was applied, saying this, the law of the case shouldn't apply to me. So then you're arguing that the district court didn't have any choice but to apply law to the case. Yes. That's exactly the district court's decision. They said this is the rule of the case under Ninth Circuit precedent. I have to follow that, and there we go. Now, you asserted these five reasons in your brief, right? Not as clearly as I have. Okay. All right. Then it's not clearly set out 1, 2, 3, 4, 5, but they're all in my brief. I think I counted five, too. Or in any of the several briefs that we filed in this case. I have a question about Nunez-Reyes in terms of that. How do the equities presented by the appellants in this case, how are they different than the equities asserted in the petition in Nunez-Reyes in that they all basically seek the same relief to be allowed to stay in the United States? In Nunez-Reyes, we are the plaintiff was, had waived a constitutional right, a constitutional right to a trial. The class in this case has not waived any constitutional right. When they reentered illegally after 1997, when the IRA-IRA took effect, it was the statute, the single statute, which was 8 U.S.C. 1182A9C2, said that if they did so, they were inadmissible and ineligible to, ineligible for admission or for a waiver until they had been outside of the United States for at least 10 years. It wasn't until the Life Act was passed many years later and after all of the class had reentered illegally, it wasn't until after that that there was even a possibility of the issue in this case. Well, they seem to focus on that as the reliance, right? Is that what they're focusing on, is their reliance that I think that they're trying to equate to the reliance on waiving a constitutional right? We say that, number one, in Nunez, it was a constitutional right that was waived. And in most of the other cases where full prospect, where prospectivity only has been applied, it is an access to the courts as in a rule of, as in court rules on venue or jurisdiction or anything else or things like that. Or in constitutional cases, that is where you see Chevron Oil and the rules announced again in Nunez applied. Let's say that we were convinced that waiver of a constitutional right is sufficient reliance, but thought that strong reliance might be enough even if it didn't happen to be a constitutional right. Do we have that here? That is not here. I don't believe that is here. Strong reliance is they applied for a, I'm sorry. Well, I think the reliance, as I read it, is that they came out of the unknown and made themselves known as re-entrants without inspection and they paid $1,000 and that those are the reliance interests that they. Well, Your Honor, I beg to disagree here a little bit. They were already inadmissible. Whether or not they, you know, they were subject to removal whenever, whether they applied for this or not, they were subject to removal. So the removability. But they cited cases, I guess, where, I mean, your position is they never were admissible so they never would have qualified for anything, right? So they can't possibly rely on what they don't qualify for. They cited some other cases where they said people like them actually got relief so they were relying on that. Is that a legitimate reliance? No. Why? We don't believe that that's a legitimate reliance because basically they re-entered the United States at a time when that, and that re-entry is what makes them inadmissible. That re-entry is, that act, that specific act is what makes them ineligible to apply until they've decided to go along with the rules set by Congress, the statutes set by Congress, and stay outside of the United States for 10 years. These people are not permanently barred from re-entry. They have the possibility of a discretionary waiver after they've been outside for 10 years. The petitions filed by their spouses in most cases will remain valid. They will always be able in the future to immigrate to the United States, but first they have to obey the law set out by Congress and stay outside of the United States for 10 years. So who is covered by, or who was covered by the LIFE Act? Who could apply under the LIFE Act? The people who were in the United States after 2000. I mean, at the time, in 2000, they had to have been in the United States. The petition had to have been filed before May of 2001. But those were people who entered illegally but not people who re-entered illegally. Is that what you're saying? Yes and no, Your Honor. And I'm sorry that I have to qualify it. If they had re-entered illegally before 1996, before the 1996 acts became, were enacted, then that re-entry would not have barred them because the, because no one has applied IRS to go retroactive as far as the 212A9C bar. But it's people who re-entered after 1996, after the rear end. If they re-entered after removal illegally, after 1996, then they would be barred from adjustment of status. Was there anyone in this class that would fit into the yes that you just asked? No. All of these, all of the class members by its definition had to have been inadmissible under 212A9C, 212. Is there any case law that would prevent us from adopting the five non-exhaustive factors stated in Montgomery, which I believe that the appellants are urging us to do, for opinions in which we affirm the agency's ruling? We had the discussion about whether I wrote an opinion or whether I, whatever, I don't know, whatever I wrote. So why shouldn't we adopt the test that they're urging us to adopt? And would it make it – and if we did adopt it in this case, would it make any difference on whether the appellants would prevail? I know that's a lot of questions, but. Well, Your Honor, that's my fourth and fifth points on how we win this case. First off, I would like to point off to – point to Morales' Chiodo and the recent decision of this Court in – the post-Nunez decision of this Court in which the Supreme Court applying both Morales' Chiodo and Duran-Gonzalez to deny relief to an individual that is the case that I cited in the 28-J letter I filed last week. But in Morales' Chiodo and in the most recent case, this Court found that the United States Supreme Court decision in Rivers said that when you have a decision involving statutory interpretation, that is necessarily fully retroactive. Nunez was a – emphatically not a decision involving statutory interpretation. Rather, in both Lujan, which is what Nunez overturned, and in Nunez, the Court made – took pains to say this is not an issue of statutory interpretation. This is an issue of equal protection. And specifically, one of the big reasons that they decided the equities favored the individual in Nunez is because the decision at – the decision implicated a waiver of constitutional rights. Nunez did not address Rivers or the whole line of cases regarding statutory interpretation. And the requirement that once the Court decides what a statute says, that is what the statute has always said. Can I ask you a question about the procedural posture of the case? This is – this is an appeal from a district court. It's not the usual kind of immigration case we are used to seeing. Is there a final order of removal already in place for these – for these folks? For some of them – for most of them, no. There is not a final – well, there – for most of them, they've all had – for all of them, necessarily, they had to have a final order of removal entered and or executed. In – but this was not an appeal of an immigration – of a removal decision. No, that's what I said. I understand this is an appeal from the district court, not the usual kind of immigration case. Right. In the district court, what plaintiffs were challenging was a DHS decision. Right. They tried to enjoin that memo, if I recall. Correct. My question is leading up to this. Are these folks going to get removed or the removal reinstated if they – if they lose? They will be – they will be eligible for reinstatement, yes. Reinstatement of the removal. Reinstatement of the removal order. All of them would – well, first, the first agency would be. Excuse me. My next question is I've been reading about how there's enhanced prosecutorial discretion in removing people. Would these folks qualify for any of that kind of discretion? Many of them would. Anything we – any role we play in that or is that? That discretion is – is retained in the – in the person of the Secretary of the Homeland Security. That is a prosecutorial discretion. Would mediation be useful in this kind of case or is that something you're working on on your own? If this was an individual case, sir, I think, Your Honor, I think that that might be a possibility. But we're not talking about an individual. We're talking about a class. Class of what, seven? No. Those are just the class representatives, Your Honor. We're talking – the class that was – was certified. But the reason – was the class certified? Yes, the class was certified. The government did not appeal class certification. The class was certified prior to the entrance at the same time. So how many – I think we asked this before, but I can't remember because this has been going on a bit, a while. How many people do you think are in this class of that? It's hard to say, Your Honor. I know that there are at least 20 cases right now pending before the courts in which the whole retroactivity analysis is challenged. It could be 200. It could – plaintiffs have estimated at the beginning that the class was in the thousands. All right. Obviously, from the government's perspective, the government does not – wants an opinion that says that this can be retroactively – that it's retroactive, right? And you want – now, even, let's say, if we publish an opinion exactly like what you want, I'm saying this hypothetically. Under, I think, what the Morton memo and everything that's going on about all of that, is there still discretion even with that opinion to give relief to individuals within the class? There is discretion with the memo to not remove individual members of the class, but they will be ineligible for adjustment of status because they are clearly inadmissible under the opinion. They would be ineligible for adjustment to lawful permanent resident status until Congress changes the law or they've stayed outside the United States for 10 years. So what does that mean exactly? You don't get – they don't get a green card, but you just leave them alone? Is that basically what that means? Prosecutorial discretion in that aspect can be any number of things. It can be not executing an order of removal, not placing them in reinstatement proceedings, or it can be going ahead and reinstating the order but not executing  So which would – which might mean that they get any number of different types of benefits like a possible work card, but they wouldn't be able to leave the United States. But that is something where the Homeland Security – Department of Homeland Security would weigh the equities of each case. In cases – people in this class are not just the named plaintiffs. People in these – in the class that it was set are people who have significant criminal history and have repeatedly reentered the United States. So the class as a whole, it would be very difficult for DHS to say, oh, we're going to give prosecutorial discretion to the class at whole because some of them may not merit it. If it was a single reentry after one removal, that's a different story from – we have in the named plaintiffs here, the class representatives, we have people who reentered two, three, four times. Well, why don't you tell me – I think you're touching on this here, but just so that I understand this from the government's perspective, what is the parade of horribles if we were to rule the way the appellants are urging us? The first parade of – the first in the parade of horribles is, is that when Congress passed the – the statute at issue, which is 1182 – 1182A9C, the whole purpose was to – to try to stop the revolving door of immigration recidivists who came back and forth all of the time, who more or less ignored their removal orders. Has there been anything changed by the recent memos that would alter the government's position that they don't want people to come back after they're removed? There's nothing at all in the recent memo that – that talks about giving – about ignoring serial reentries. Let me ask my colleagues if they have any other questions, because I see you're out of – out of time. I guess not. Thank you very much, Ms. Stewart. Thank you. Mr. Adams. Thank you. Just briefly, we'd like to reiterate, as we pointed out in our response to the 28-J letter, that although the government argues that the Nunes-Reyes holding should be limited to constitutional issues, this doesn't find support in the language of Nunes-Reyes. And in Chevron Oil itself, it was addressing a statutory issue. There was no constitutional challenge at play. Along the line of the history of case law regarding Chevron Oil, there's no support for the government's position that it should only be limited to constitutional reliance. Here, as in Nunes-Reyes, you had a court order finding that this class of individuals is inadmissible, but looking at actions that they took in reliance. And I would just emphasize the action that they took in reliance was the applications that they filed, the thousands of dollars, and presenting themselves to the government. And I'd note that in Nunes-Reyes, for example, they cited St. Cyr saying, quote, there is a clear difference for purposes of the retroactivity analysis between facing possible deportation and facing certain deportation, end quote. So while these individuals were inadmissible, they still nonetheless qualified for a waiver, qualified for adjustment pursuant to this Court's decision in Perez-Gonzalez. The government says they had nothing to rely on because they were inadmissible. Well, they had clear reliance on this Court's precedent. This Court's precedent was further extended in Acosta v. Gonzalez. Under this Court's jurisdiction up until Duran-Gonzalez, the law of this circuit supported their application as recognized by the board, for example, in the half a dozen unpublished decisions that we submitted. Moreover, in a recent case from this Court, in Chaik's Court, they recognized that an affirmative application for relief on which they were eligible at the time should weigh in to that retroactivity analysis. Well, why don't those unpublished ‑‑ why couldn't I look at those unpublished decisions as just saying instances where they didn't follow the law, that they just chose to, you know, I mean, I don't want to say that judges have been known not to follow the law, but I think in immigration cases, certainly we find people viewing them differently. Well, I think if you look at published decisions from the board, like Matter of Briones, which focused on the Acosta, the other parallel track here, they said we're announcing this rule, but we're not sure what we're going to do in the Ninth or Tenth Circuit. So they explicitly made clear that even though the agency was applying interpretation, they weren't necessarily issuing that interpretation for the Ninth Circuit. And you have other cases, like Matter of Ramirez, where they specifically said, pursuant to Brand X, we're asserting the authority to apply this even within the Ninth Circuit. And so you can contrast that clear language with what's at play here, and that supports those unpublished decisions. Mr. Kennedy, anything else? Judge Kelley? Thank you very much, Mr. Chairman. Ms. Stevens, thank you, too. The case just argued is submitted and will stand in recess. All rise. This court, for this session, stands adjourned. Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Canby, Silverman, Callahan